Robert S. Westermann (VSB No. 43294)
Sheila deLa Cruz (VSB No. 65395)
Hirschler Fleischer, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
P.O. Box 500
Richmond, Virginia 23218-0500
Phone: (804) 771-9500
Fax:   (804) 644-0957
Email: rwestermann@hf-law.com
       sdelacruz@hf-law.com

*Counsel for Debtor, Carter's Grove, LLC*

Debra I. Grassgreen (*pro hac vice*)
John W. Lucas (*pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA  94111-4500
Phone: (415) 263-7000
Fax:   (415) 263-7010
Email: dgrassgreen@pszjlaw.com
       jlucas@pszjlaw.com

*Counsel for Debtor, Carter's Grove, LLC*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## NEWPORT NEWS DIVISION

| | |
|---|---|
| In re:<br><br>**CARTER'S GROVE, LLC,**<br><br>Debtor. | Case No.: 11-51330-STS<br><br>Chapter 11<br><br>**DEBTOR'S DISCLOSURE STATEMENT IN SUPPORT OF AMENDED PLAN OF REORGANIZATION OF CARTER'S GROVE, LLC**<br><br>**Disclosure Statement Hearing:**<br><br>Date:   October 21, 2011<br>Time:   9:30 a.m.<br>Place: 600 Granby Street, 4th Floor,<br>          Norfolk, Virginia 23510<br>Judge: Honorable Stephen C. St. John |

THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN.   ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.   THE DEBTOR RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS DISCLOSURE STATEMENT.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND PLAN OVERVIEW ...........................................................1

    A.    Introduction ........................................................................................1

    B.    Information Regarding the Plan ..........................................................2

        1.    Plan Governing Document. ...................................................2

        2.    Source of Information...........................................................3

        3.    Warning Regarding Federal and State Income Tax Consequences of the Plan ..........................................................3

        4.    Bankruptcy Court Approval ..................................................3

    C.    Voting Instructions ............................................................................4

        1.    How to Vote .........................................................................4

        2.    Who May Vote .....................................................................4

    D.    Confirmation......................................................................................5

    E.    Disclaimers .......................................................................................7

    F.    Plan Overview .................................................................................11

II. OVERVIEW OF CHAPTER 11 CASE.............................................................13

    A.    Events Leading Up to the Filing of the Chapter 11 Case ...............13

        1.    Description of the Debtor ....................................................13

        2.    Debtor's Assets...................................................................14

        3.    Debtor's Liabilities.............................................................14

        a.    CWF Deed of Trust .............................................................14

        b.    AVN Guarantee and Deed of Trust .....................................15

        c.    Sotheby's Deed of Trust ......................................................16

        d.    Tax Claims...........................................................................17

        e.    Priority Employee Claims ...................................................17

        f.    Trade Debt ...........................................................................17

        4.    The Bankruptcy Filing.........................................................18

        5.    The Debtor's Management ...................................................19

    B.    Summary of Events During the Debtor's Chapter 11 Case.............19

        1.    Postpetition Management ....................................................19

        2.    CWF's Motion to Transfer Venue.......................................19

3.    Filing of Schedules, Meeting of Creditors and Bar Date ...............................20

4.    Retention of Professionals .........................................................................21

5.    Objection to Secured Claim of CWF ...........................................................21

6.    Postpetition Settlement with AVN ...............................................................23

7.    Postpetition Discussions with Sotheby's .....................................................23

8.    Approval of the Disclosure Statement and Solicitation Procedures...............23

III. DESCRIPTION OF THE PLAN ...........................................................................24

A.    Description Of Classes .......................................................................................24

B.    Treatment of Unclassified Claims .......................................................................25

1.    Allowed Administrative Expense Claims......................................................25

2.    Allowed Priority Tax Claims .......................................................................25

C.    Treatment of Classified Claims and Interests .......................................................26

1.    Allowed Other Priority Claims ....................................................................27

2.    Secured Claim of CWF................................................................................27

3.    Secured Claim of AVN ................................................................................28

4.    Secured Claim of Sotheby's .........................................................................28

5.    Other Secured Claims ..................................................................................28

6.    General Unsecured Claims ...........................................................................29

7.    Interests......................................................................................................29

D.    Implementation of the Plan..................................................................................29

1.    Effective Date Transactions.........................................................................29

2.    Revesting of Estate Assets...........................................................................30

3.    Continued Existence ....................................................................................30

4.    Management of Reorganized Debtor.............................................................30

5.    Continued Management of Reorganized Debtor .............................................31

6.    Retained Claims and Defenses .....................................................................32

7.    Distribution Procedures ...............................................................................33

8.    Resolution of Disputed Claims.....................................................................33

9.    Allocation of Distributions...........................................................................34

10.   Disputed Payments. .....................................................................................34

11.   Unclaimed Property......................................................................................34

12.   Setoffs ........................................................................................................35

13.   No Distributions on Late-Filed Claims .........................................................35

14.   Post-Effective Date Reports ..................................................................35
15.   Post Effective Date Employment and Compensation of Professionals ...........36
16.   Final Decree.........................................................................................36
E.   Executory Contracts ........................................................................................36
F.   Conditions to Confirmation of the Plan...........................................................37
G.   Effects of Confirmation ...................................................................................38
1.   Binding Effect......................................................................................38
2.   Revesting of Property Free and Clear...................................................39
3.   Discharge of Debtor.............................................................................39
4.   Injunction ............................................................................................40
5.   Full and Final Satisfaction....................................................................41
6.   Limitation of Liability ..........................................................................41
IV. OTHER PLAN PROVISIONS...................................................................................42
A.   Retention of Jurisdiction..................................................................................42
B.   Exemption from Transfer Taxes ......................................................................43
C.   Post-Confirmation Date Notices ......................................................................43
D.   Certain Actions ...............................................................................................43
V. TAX DISCLOSURE ................................................................................................44
A.   Tax Implications .............................................................................................44
1.   Tax Consequences to the Reorganized Debtor......................................45
2.   Tax Consequences to Creditors ...........................................................45
VI. LIQUIDATION ANALYSIS .....................................................................................46
VII. RISK ANALYSIS..................................................................................................48
VIII. CONFIRMATION OF THE PLAN .........................................................................50
A.   Confirmation Hearing......................................................................................50
B.   Requirements For Confirmation ......................................................................50
C.   Classification of Claims and Interests ..............................................................51
D.   Acceptance......................................................................................................51
E.   Best Interests of Creditors ..............................................................................52
F.   Feasibility .......................................................................................................52
G.   Cramdown ......................................................................................................54
H.   Alternatives to Confirmation of Plan...............................................................55
IX. RECOMMENDATION AND CONCLUSION ...............................................................55

<u>EXHIBITS</u>

A  –    Debtor's Plan of Reorganization

B  –    Disclosure Statement Order

**I.**

**INTRODUCTION AND PLAN OVERVIEW**

**A.    Introduction**

On February 14, 2011, the Debtor,[1] Carter's Grove, LLC, commenced a bankruptcy case

by filing a voluntary petition under chapter 11 of the Bankruptcy Code.  The Debtor's case is

administered in the United States Bankruptcy Court for the Eastern District of Virginia, Newport

News Division, before the Honorable Stephen C. St. John.

This Disclosure Statement  contains information with respect to the Plan proposed by the

Debtor.  Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being

distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

**The Debtor is solvent and the Plan provides for all Allowed Claims to be paid in full**.  The

Plan also provides that if the Debtor defaults on any Plan obligations, the Debtor's property will

be sold pursuant to the Orderly Sale Process.  The Debtor has examined various alternatives and,

based on information contained in this Disclosure Statement, has proposed the Plan because it

provides for full recovery to creditors while, at the same time, preserving the substantial equity

in the Debtor's main asset for the Interest Holder.

As discussed herein, the Debtor was formed for the sole purpose of holding title to

Carter's Grove, an historic 475 acre property in Virginia.  The Debtor does not maintain or carry

on any business or operations at Carter's Grove.  As a result, the Debtor does not have any

income but is instead entirely dependent upon Mr. Minor, the controlling principal of the Debtor,

to pay debt service and to fund day-to-day expenses and capital expenditures.  Under the Plan,

---

[1] Except as otherwise provided herein, capitalized terms used in this Disclosure Statement will have the meanings
set forth in the Plan, which is attached hereto as **Exhibit A**.

Mr. Minor will fund the continued maintenance and operating expenses of the Debtor and the payments to Creditors pursuant to the terms and conditions set forth in the Plan.

The Disclosure Statement describes the Plan and contains information concerning, among other matters, the history, management, and assets and liabilities of the Debtor, and the proposed distribution to Creditors. The Debtor requests that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Your vote on the Plan is important. In order for the Plan to be accepted by a Class of Claims, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims in such Class who vote on the Plan must vote for acceptance. The Debtor is soliciting the votes of members of Class 2 (Secured Claim of CWF), Class 3 (Secured Claim of AVN), Class 4 (Secured Claim of Sotheby's) and Class 5 (Other Secured Claims).

Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy Code, or to the confirmation of another plan. These alternatives may not provide for a distribution of as much value to holders of Allowed Claims as the Plan. Accordingly, the Debtor urges you to accept the Plan by completing and returning the enclosed ballot no later than 4:00 p.m. (Pacific) [DATE], 2011.

**B.**      **Information Regarding the Plan**

      **1.**      **Plan Governing Document.**

Although the Debtor believes that this Disclosure Statement accurately describes the Plan, all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and the documents described therein which are controlling.

2.    **Source of Information.**

Factual information, including all financial information, contained in this Disclosure

Statement has been provided by the Debtor, Mr. Minor, or has been obtained from the Debtor's

records, except where otherwise specifically noted.  Neither the Debtor nor Mr. Minor represents

or warrants that the information contained in this Disclosure Statement is free from any

inaccuracy.  The Debtor and, to the extent applicable, Mr. Minor, have attempted to present the

information accurately and fairly, and the Debtor and Mr. Minor believe that the information is

substantially accurate.  The sources and amounts of payments to Creditors represent the best

estimate of the Debtor and Mr. Minor as to what they expect will happen.  Because these are

only assumptions about or predictions of future events, many of which are beyond the Debtor's

or Mr. Minor's control, there can be no assurances that the assumptions will in fact materialize or

that the projected realizations will in fact be met.  Except as otherwise provided herein, this

Disclosure Statement will not reflect any events that occurred subsequent to the date that the

Debtor submitted the Disclosure Statement to the Bankruptcy Court for approval.

3.    **Warning Regarding Federal and State Income Tax Consequences of the Plan**

The tax consequences of the Plan will vary based on the individual circumstances of each

holder of a Claim.  Accordingly, each Creditor is strongly urged to consult with its own tax

advisor regarding the federal, state, local and foreign tax consequences of the Plan.

4.    **Bankruptcy Court Approval**

Following a hearing held on [DATE], 2011, the Bankruptcy Court approved this

Disclosure Statement as containing information of a kind and in sufficient detail adequate to

enable a hypothetical, reasonable investor to make an informed judgment about the Plan.  Under

section 1125 of the Bankruptcy Code, this approval enabled the Debtor to send you this

Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, passed any judgment on the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

**C.**    **Voting Instructions**

    **1.**    **How to Vote**

A ballot is enclosed herewith for Creditors to use in voting on the Plan. To vote on the Plan, indicate on the enclosed ballot that you accept or you reject the Plan and sign your name and mail the ballot in the envelope provided for this purpose.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 4:00 P.M. prevailing Pacific Time on [DATE], 2011 at the following address:**

> Pachulski Stang Ziehl & Jones LLP
> 150 California Street, 15th Floor
> San Francisco, California  94111-4500
> Telephone:  (415) 263-7000
> Attn:  John W. Lucas and Patricia Jeffries

### DO NOT SEND YOUR BALLOT VIA FACSIMILE OR E-MAIL.

If your ballot is not properly completed, signed, and returned as described, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

    **2.**    **Who May Vote**

The Plan divides the Claims of Creditors into six (6) Classes. There is one (1) Class of Interests.

Classes of Creditors that are impaired by the Plan are entitled to vote. Each holder of an Allowed Claim in an impaired Class that will receive distributions under the Plan on account of

such Claims may vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities.

Class 2 (Secured Claim of CWF), Class 3 (Secured Claim of AVN), Class 4 (Secured Claim of Sotheby's), and Class 5 (Other Secured Claims) are impaired under the Plan and are entitled to vote thereon, unless the claim in such Class is disputed.  Class 1 (Other Priority Claims), Class 6 (Unsecured Claims), and Class 7 (Interests) are unimpaired under the Plan and are not entitled to vote thereon.  Accordingly, the Debtor is soliciting acceptances only from the members of Class 2, Class 3, Class 4, and Class 5.

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim.  Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim which has not been objected to or disallowed prior to ninety (90) days after the Effective Date of the Plan.  The Ballot form which you received does not constitute a proof of Claim.

**D.**     **Confirmation**

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization.  At the Confirmation Hearing, to confirm the Plan, the Debtor must demonstrate that it has met the requirements of section 1129 of the Bankruptcy Code.  If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan.  The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

Voting is tabulated by class. As discussed above, a class of creditors has accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditors holding allowed claims in that class who actually vote to accept or reject such plan.

Even if a class of creditors or interests votes against a plan of reorganization, that plan may nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the Plan by that class, so long as certain statutory requirements are met by the plan. This procedure is called a "cram down." The Debtor will seek confirmation of the Plan through a cram down if either Class 2, Class 3, Class 4, or Class 5 rejects the Plan.

The Bankruptcy Court has set [DATE], 2011, as the hearing date to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. This hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order. Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below on or before the date set forth in the Notice of Confirmation Hearing sent to you with this Disclosure Statement and the Plan. Counsel on whom objections must be served are:

> (1) Counsel for the Debtor:
>
> Pachulski Stang Ziehl & Jones LLP
> 150 California Street, 15th Floor
> San Francisco, CA 94111
> Telephone: (415) 263-7000
> Facsimile: (415) 263-7010
> Attn: Debra I. Grassgreen and John W. Lucas

Hirschler Fleisher, P.C.
The Edgeworth Building
2100 Cary Street
Richmond, Virginia
P.O. Box 500
Richmond, VA 23218-0500
Telephone:  (804) 771-9500
Facsimile:  (804) 664-0957
Attn:  Robert S. Westermann and Sheila deLa Cruz

    and

(2) The Office of the United States Trustee

Office of the United States Trustee
Assistant U.S. Trustee
Room 625 Federal Building
200 Granby Street
Norfolk, VA  23510
Attn:   Debera F. Conlon and Kenneth N. Whitehurst III

## E.   **Disclaimers**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY

BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED

PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THIS

DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND,

AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT

OF THE NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE

DEBTOR'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL

REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF

THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE

PLAN.  *SEE* 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT

SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY

SUMMARY. *IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.*

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

NO REPRESENTATIONS CONCERNING THE DEBTOR'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL," "INTEND," AND "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY FORWARD-LOOKING STATEMENTS. ALTHOUGH THE DEBTOR BELIEVES THAT ITS ESTIMATES AND ASSUMPTIONS REFLECTED IN THOSE FORWARD-LOOKING STATEMENTS ARE REASONABLE, THE DEBTOR CAN GIVE NO ASSURANCE THAT SUCH ESTIMATES AND ASSUMPTIONS WILL BE REALIZED. FORWARD-LOOKING STATEMENTS ARE BASED ON ASSUMPTIONS THAT ARE UNAVOIDABLY AND

INHERENTLY IMPRECISE. ACTUAL RESULTS, PERFORMANCE, OR
ACHIEVEMENTS WILL LIKELY DIFFER MATERIALLY FROM THOSE
CONTEMPLATED, EXPRESSED, OR IMPLIED BY THE FORWARD-LOOKING
STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR
UNDERTAKES NO OBLIGATION TO UPDATE OR REVISE ANY FORWARD-LOOKING
STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, WHETHER AS A
RESULT OF NEW DEVELOPMENTS OR OTHERWISE.

THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE
STATEMENT AND IN ANY EXHIBITS TO THE DISCLOSURE STATEMENT, UNLESS
OTHERWISE INDICATED, IS UNAUDITED. REASONABLE EFFORT HAS BEEN MADE,
HOWEVER, TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

ALL PROFESSIONALS FOR THE DEBTOR HAVE RELIED UPON INFORMATION
PROVIDED BY THE DEBTOR IN CONNECTION WITH PREPARATION OF THIS
DISCLOSURE STATEMENT. ALTHOUGH PROFESSIONALS FOR THE DEBTOR HAVE
PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE
PREPARATION OF THIS DISCLOSURE STATEMENT, THE PROFESSIONALS HAVE
NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED IN OR
ATTACHED TO THE DISCLOSURE STATEMENT.

UNLESS YOUR CLAIM IS ALLOWED, IN WHOLE OR IN PART, UNDER THE
PLAN, THE ABILITY OF THE DEBTOR AND OTHER CREDITORS OR PARTIES IN
INTEREST TO OBJECT TO YOUR CLAIM IN ACCORDANCE WITH THE PLAN AND
APPLICABLE LAW IS BEING PRESERVED AND NOT WAIVED UNDER THE PLAN.
MOREOVER, ANY RIGHTS OF ACTION AGAINST YOU IN FAVOR OF THE DEBTOR

ARE BEING PRESERVED UNDER THE PLAN. THE DEBTOR IS ATTEMPTING TO

PROVIDE YOU ADEQUATE INFORMATION TO MAKE AN INFORMED JUDGMENT AS

TO WHETHER TO ACCEPT OR REJECT THE PLAN. THE DEBTOR DOES NOT

BELIEVE THAT THIS RESERVATION OF RIGHTS SHOULD AFFECT YOUR DECISION

ON HOW TO VOTE ON THE PLAN. ALTHOUGH THE DEBTOR BELIEVES THAT THE

CONFIRMATION OF THE PLAN IS IN THE INTERESTS OF CREDITORS OF THE

DEBTOR, THIS ADVISORY IS PROVIDED TO ENSURE THAT YOU DO NOT ASSUME,

BY THE DEBTOR'S SOLICITATION OF YOUR VOTE, BY THE ESTIMATES

CONTAINED IN THE DISCLOSURE STATEMENT, OR BY ANY OTHER PROVISIONS

OF THE PLAN OR DISCLOSURE STATEMENT (OTHER THAN AN EXPRESS

PROVISION OF THE PLAN ALLOWING YOUR CLAIM OR WAIVING SPECIFIED

RIGHTS OF ACTION AGAINST YOU) THAT THE DEBTOR, THE REORGANIZED

DEBTOR, OTHER CREDITORS, OR OTHER PARTIES IN INTEREST WILL NOT OBJECT

TO YOUR CLAIM OR THAT THE DEBTOR WILL NOT PURSUE ANY RIGHT OF

ACTION AGAINST YOU. INSTEAD, FOR THE PURPOSE OF DECIDING HOW TO VOTE

ON THE PLAN, IF YOUR CLAIM IS NOT EXPRESSLY ALLOWED UNDER THE PLAN,

YOU SHOULD ASSUME THAT THE DEBTOR, THE REORGANIZED DEBTOR, OR

THEIR RESPECTIVE SUCCESSORS OR REPRESENTATIVES WILL (A) OBJECT TO

YOUR CLAIM AND (B) ASSERT ALL SETOFFS, RECOUPMENTS, RIGHTS TO

SUBORDINATE, OR AFFIRMATIVE CLAIMS THAT THE DEBTOR, THE

REORGANIZED DEBTOR, OR THEIR RESPECTIVE SUCCESSORS MAY HAVE WITH

RESPECT TO YOU AND/OR YOUR CLAIMS AGAINST THE DEBTOR.

## F.    **Plan Overview**

The Plan provides that all Allowed Claims will be paid in full (unless otherwise agreed to by the Creditor), either on the Effective Date or over time with interest.  The Minor Trust, the sole member of the Debtor, will retain its Interests in the Debtor.  The Debtor obtained a recent appraisal that estimates the fair market value of its sole asset – Carter's Grove – at $15.8 million, which is substantially more than the approximate $7.3 million[2] in claims asserted against the Debtor.  The Plan allows Creditors to be made whole, while preserving the equity in Carter's Grove.  The following chart briefly summarizes the treatment of Creditors and Interest Holders under the Plan.  Amounts listed below are estimated.

| Class No. | Claims | Estimate of Claim Amounts[3] and Recoveries | Treatment |
|---|---|---|---|
| N/A | Allowed Administrative Claims | $500,000<br><br>100% | Each Allowed Administrative Claim, unless the holder of such Claim has agreed to a different treatment, will be paid in full by a one-time Cash payment by the Reorganized Debtor on the latest of: (a) the Effective Date; (b) such date as may be fixed by the Bankruptcy Court; (c) the fourteenth day after such Claim is Allowed; and (d) such date as the holder of such Claim and the Reorganized Debtor may agree. |
| N/A | Allowed Priority Tax Claims | $54,500<br><br>100% | At the Debtor's option, either a one-time Cash payment on the Effective Date or periodic cash payments plus statutory interest. |
| 1 | Allowed Other Priority Claims | $0.00<br><br>100% | At the Debtor's option, either a one-time Cash payment on the Effective Date or periodic cash payments plus interest. |

---

[2] The claim filed by AVN in the amount of $5 million is contingent.  If Mr. Minor makes the remaining payments scheduled under his restructuring agreement with AVN (*i.e.*, approximately $810,000), the excess amount of AVN's claim will be automatically withdrawn.  To date, all payments owed to AVN have been made.

[3] As discussed herein, the general claims bar date has not yet passed as of the filing of this Disclosure Statement.  Thus, the Debtor is still in the process of reviewing proofs of claim.  The total amount of Allowed Claims for a particular category or Class may differ substantially from the estimated amounts set forth herein.

| Class No. | Claims | Estimate of Claim Amounts[3] and Recoveries | Treatment |
|---|---|---|---|
| 2 | Allowed Secured Claim of CWF | $4,100,000[4]<br><br>100% | On the later of the Effective or as soon as the Secured Claim of CWF is Allowed, the holder of an Allowed Class 2 Claim will receive the New CWF Note pursuant to which the holder will receive:  (i) quarterly interest payments at the rate of 3.25% per annum subject to a default rate of 5.25%; (ii) payment of all outstanding interest and principal on or before three years after the Effective Date.  All payment obligations are subject to a 15 day window to cure any Plan Default.  If any Plan Default is not cured within this 15 day window, the Debtor will be required to sell Carter's Grove pursuant to the Orderly Sale Process. |
| 3 | Secured Claim of AVN | $810,000[5]<br><br>100% | On the Effective Date, the holder of an Allowed Class 3 Claim shall retain, unaltered, all of the legal, equitable and contractual rights to which such Claim entitles the holder except that in the event of a Plan Default, in addition to the remedies AVN may have against Minor, the sole remedy on account of the AVN Guarantee and the AVN Deed of Trust will be the Orderly Sale Process, rather than foreclosure. |
| 4 | Secured Claim of Sotheby's | $2,300,000[6]<br><br>100% | On the Effective Date, the holder of an Allowed Class 4 Claim shall retain, unaltered, all of the legal, equitable and contractual rights to which such Claim entitles the holder except that (i) in the event of a Plan Default, in addition to any remedies Sotheby's has against Minor, the sole remedy against the Reorganized Debtor will be the Orderly Sale Process, rather than foreclosure and (ii) section 2(a) of the Sotheby's Agreement shall be amended to replace December 31, 2011 with March 31, 2012. |
| 5 | Other Secured Claims | None[7]<br><br>100% | On or prior to the Effective Date, the Debtor will select whether to (i) abandon or surrender the property securing such Claim; (ii) pay Cash equal to the amount of such Claim; or (iii) leave the rights of the holder of such Claim unimpaired. |
| 6 | Unsecured Claims | $62,000<br><br>100% | Except to the extent that the holder of an Allowed Unsecured Claim accepts, or has accepted, less favorable treatment, each holder of an Allowed Unsecured Claim will receive a Cash payment in full and final satisfaction of such Claim equal to 100% of the amount of its Allowed Claim on the later of the Effective Date or the date the Unsecured Claim is Allowed. |
| 7 | Interests | 100% | The legal, equitable, and contractual rights of the holder of the Interests shall be left unaltered. |

---

[4] Generally in line with the Debtor's estimate, CWF filed a proof of claim (Claim No. 2) in the amount of $4.078 million.  However, the Secured Claim of CWF is subject to objection in its entirety by the Debtor.  As a result, the Allowed Claim maybe substantially less than the amount set forth in CWF's proof of claim.

[5] The above-described amount of the AVN Secured Claim represents the remaining payments due under the AVN Lease Documents.  However, AVN has a contingent claim for $5,000,000 pursuant to AVN Lease Documents in the event the outstanding amount due is not paid.

[6] The value of Sotheby's claim reflects payments that have already been made for the benefit of Sotheby's.

[7] The Debtor is unaware of any Class 5 Claims.

## II.

## OVERVIEW OF CHAPTER 11 CASE

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Case to date, including events leading up to the commencement of this case. Copies of all relevant court papers are on file with the Bankruptcy Court.

A.   **Events Leading Up to the Filing of the Chapter 11 Case**

1.   **Description of the Debtor**

As discussed above, Carter's Grove is located in the town of Grove, James City County, Virginia, located along Route 60, eight miles east from historic Williamsburg. The area includes a number of estate properties dating to the 18th and 19th centuries. These properties, like the Carter's Grove property, were customarily located on navigable waterways which were originally used as transportation routes. Prior to the Debtor's acquisition of Carter's Grove, CWF owned and operated Carter's Grove as a museum for over 20-years and, in 2002, closed the property to the public.

Subsequently, on or about October 22, 2007, the Minor Trust and CWF entered a contract for the purchase and sale of Carter's Grove. The Minor Trust purchased Carter's Grove from CWF for an initial purchase price of $15,300,000 (the "Sale"), subject to the terms of the CWF Note and secured by the CWF Deed of Trust in favor of CWF. The agreed purchase price was payable as $5,000,000 cash and the CWF Note in the amount of $10,300,000 payable in six consecutive semi-annual installments of $1,766,666.67 beginning on July 15, 2008 through January 15, 2011.

The Minor Trust is the named purchaser of Carter's Grove. However, the purchase agreement was assigned to the Debtor with the consent of CWF at or about the time of the Sale.

Accordingly, the Debtor, a Virginia limited liability company, was formed on December 10, 2007 to hold title to Carter's Grove. The sole member of the Debtor is the Minor Trust. Mr. Minor is the trustee of the Minor Trust, the designated manager of the Debtor, and the sole beneficiary of the Minor Trust.

### 2.   Debtor's Assets

The Debtor's primary asset is Carter's Grove. Subject to Debtor's analysis of potential causes of action and claims other than those asserted in the CWF Adversary Proceeding, the Debtor has no other assets of material value.

In May 2011, after the stabilization of the real estate market, the Debtor obtained an appraisal (the "Appraisal") of Carter's Grove, which shows, based on the assumptions and conditions set forth therein, that Carter's Grove is worth no less than $15,800,000. In preparing the Appraisal, sales, cost, and demographic information were gathered, confirmed, and analyzed. Local sources of information included, but were not limited to, area real estate brokers, property managers, property owners, and government officials. Published sources of information included various government and investment publications.

The Debtor believes the value of Carter's Grove is no less than $15,800,000 million provided that the property is marketed for a sufficient amount of time, which might be up to twelve (12) months. Accordingly, the Debtor believes that the fair market value of Carter's Grove substantial exceeds the $7.3 million in Claims asserted against the Debtor. Notably, there is an equity cushion of 300% with respect to the Secured Claim of CWF and substantial equity with respect to the Secured Claims of both AVN and Sotheby's.

### 3.   Debtor's Liabilities

### a.   CWF Deed of Trust

In December 2007, the Debtor (through Mr. Minor) executed the CWF Note for the benefit of CWF promising to pay $10,300,000 in exchange for the purchase of Carter's Grove. The CWF Note requires the Debtor to make six installment payments beginning July 15, 2008, each in the amount of $1,766,666.67. Subsequent installment payments were due every six months thereafter until the CWF Note was paid in full. The Debtor's repayment obligations under the CWF Note are secured by the CWF Deed of Trust, which provides CWF with a first priority interest in the Debtor's property and the personal guarantee of Mr. Minor.

As of the Petition Date, the Debtor had not made the last two installment payments due under the CWF Note (July 15, 2010 and January 15, 2011). Accordingly, CWF filed a secured proof of claim against the Debtor's estate in the approximate amount of $4.078 million.

b.   **AVN Guarantee and Deed of Trust**

The Minor Trust for the benefit of Mr. Minor entered into the AVN Lease, dated May 22, 2005, with AVN for a certain aircraft. In or around February 2010, Mr. Minor and AVN restructured the obligations under the AVN Lease by entering into various forbearance, modification, and guaranty agreements. To secure the payment obligations under these agreements, Carter's Grove guaranteed the obligations to AVN in the maximum amount of $5,000,000 and executed the AVN Deed of Trust, dated February 1, 2010, in favor of AVN having a limitation of liability of $5,000,000. It should be noted that AVN agreed that the $5,000,000 would only be due and owing if the Minor Trust or Mr. Minor failed to pay the remaining payments due under the restructured AVN Lease Documents. On the date hereof, the outstanding payments owing to AVN are approximately $810,000. The Minor Trust and Mr. Minor will continue to make all payments due under the AVN Lease Documents. Accordingly,

the Debtor estimates that the Secured Claim of AVN is approximately $810,000, inasmuch as the $5,000,000 is contingent.

        c.      **Sotheby's Deed of Trust**

Prior to the Petition Date, Sotheby's obtained a judgment against Mr. Minor arising from his purchase of certain art from Sotheby's. Mr. Minor satisfied the initial judgment through a payment of over $6 million to Sotheby's and appealed that judgment. Thereafter, in November 2010, Sotheby's obtained an additional judgment for attorneys' fees (the "Fee Judgment"). Sotheby's subsequently executed on the Fee Judgment and obtained liens and restraining notices against various art, furniture, and design property belonging to Mr. Minor (the "Personal Property") having an approximate value in excess of $6-$8 million. Sotheby's also levied upon cash and receivables owing to Mr. Minor (approximately $1.3 million) that was generated from the sale of certain art belonging to Mr. Minor. As a result, from early November 2010 through the Petition Date, Mr. Minor's assets were completely frozen.

On or around February 14, 2011, Mr. Minor and Sotheby's entered into the Sotheby's Settlement Agreement regarding the Fee Judgment and the appeal of the prior judgment. In connection therewith, Mr. Minor agreed to (i) withdraw the appeal, (ii) permit Sotheby's to sell the Personal Property and use the sale proceeds to pay secured tax claims and to satisfy the $3.4 million Fee Judgment, and (iii) cause the Debtor to execute the Sotheby's Deed of Trust in favor of Sotheby's to secure Mr. Minor's payment of the Fee Judgment. On the date hereof, the Debtor estimates that the total amount owed to Sotheby's is approximately $2.3 million.

Notably, as part of the Sotheby's Settlement Agreement, the State of California Franchise Tax Board and Mr. Minor agreed to a repayment plan regarding states taxes. This agreement provides for the necessary consent State of California Franchise Tax Board of the Personal

Property. In addition, Mr. Minor is currently in discussions with the Internal Revenue Service regarding the payment of federal taxes and obtaining its consent to the sale of the Personal Property.

       d.    **Tax Claims**

James City County has a lien against Carter's Grove arising from the Debtor's obligation to pay certain property taxes. The property taxes were assessed on June 5, 2010 and December 6, 2010. As of the Petition Date, the Debtor estimates that James City County is owed approximately $22,000.

The IRS has filed a claim against the Debtor in the approximate amount of $32,400 on account of certain payroll and FICA taxes relating to the Debtor's employees. The Debtor believes that it has been all related payroll and FICA taxes and is discussing the basis of the claim with the IRS.

       e.    **Priority Employee Claims**

The Debtor has identified in its Schedules less than $15,000 in potential Priority Employee Claims owed to three individuals. However, since the Petition Date, Mr. Minor has paid these clams with his personal funds. Accordingly, on the date hereof, there are no prepetition Priority Employee Claims.

       f.    **Trade Debt**

Of the twelve general unsecured creditors listed in the Debtor's Schedules, seven are utilities, two are insurance related, and two relate to services provided to Carter's Grove. In the aggregate, the Debtor has scheduled trade claims totaling approximately $62,000.

4.      **The Bankruptcy Filing**

The commencement of the Debtor's chapter 11 case was precipitated by Mr. Minor's liquidity issues. As noted, the Debtor does not operate or generate any revenue. All of the expenses of maintaining and preserving Carter's Grove have at all times been funded by Mr. Minor.

As discussed above in connection with the Secured Claim of Sotheby's, Mr. Minor's liquid assets were frozen from early November 2010 through the Petition Date. Mr. Minor has also been embroiled in costly and protracted litigation for the past several years, and his ability to monetize assets was adversely impacted by the overall economic downturn in the U.S.

As a result, Mr. Minor could not fund payments to CWF. Consequently, on or about January 26, 2011, CWF quickly initiated foreclosure proceedings, and the foreclosure sale was noticed on an extremely short timetable (approximately three weeks) for February 15, 2011. The proposed foreclosure sale was scheduled to take place at the circuit court located in Williamsburg, Virginia with little, if any, marketing or exposure of Carter's Grove to prospective buyers.

Given the substantial amount of equity left in the Debtor's property (approximately $8.4 million), on February 14, 2011, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor's case was filed prior to the scheduled foreclosure sale in order to preserve the Debtor's substantial equity in Carter's Grove. Since the Petition Date, the Debtor continues to manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or committee has been appointed in this chapter 11 case. Also since the Petition Date, Mr. Minor has funded approximately $213,500 in operating insurance, maintenance expenses, and employee wages.

### 5.    The Debtor's Management

Mr. Minor has at all relevant times been overseeing the preservation and management of Carter's Grove and will continue to do so after the Effective Date. Mr. Minor is the trustee of the Minor Trust, the sole member of the Debtor. Mr. Minor is a successful entrepreneur, having founded CNET, a media company, and various other successful technology businesses. Mr. Minor ran CNET for approximately eight years, during which time it became one of the Internet's first companies to achieve profitability. CNET was later purchased by CBS in 2008 and is now CBS Interactive. Mr. Minor is an avid preservationist, and is managing Carter's Grove as a personal passion; he is not paid by the Debtor for his services.

### B.    Summary of Events During the Debtor's Chapter 11 Case

The following is a summary of important events that have taken place since the Petition Date.

### 1.    Postpetition Management

Since the Petition Date, the Debtor's property has been under the direct supervision of Mr. Minor and certain of his employees, two of whom live on the Carter's Grove premises. In this regard, the Debtor, through Mr. Minor, has been attending to the day-to-day management and welfare of the Debtor's property and has been funding ongoing operating expenses in the aggregate amount of $213,500 relating to property insurance, employee wages, and various utility expenses necessary to maintain interior of mansion located on Carter's Grove.

### 2.    CWF's Motion to Transfer Venue

On March 3, 2011, CWF filed the Venue Motion. On March 23, 2011, the Debtor filed its objection to the Venue Motion [California Docket No. 33], and its two other secured creditors, AVN and Sotheby's filed their opposition to the Venue Motion [California Docket

Nos. 32 and 36]. On March 30, 2011, the California Bankruptcy Court issued the Tentative

Ruling regarding the Venue Motion. In the Tentative Ruling, the California Bankruptcy Court

stated that "[w]hether venue should be transferred depends upon what activities will be important

to the administration of the case." In that regard, the Court noted that if the Debtor objects to

CWF's claim on the basis of (a) misrepresentation or (b) any challenge to the conservation

easements, that such matters should be heard in Virginia. However, if the Debtor's principal

seeks additional time to restructure the Debtor's obligations so that they can be paid in full, the

case should remain in the Northern District of California.

As discussed in greater detail below, the Debtor commenced the CWF Adversary

Proceeding in which the Debtor objects to the proof of claim filed by CWF and asserts other

counterclaims. In response to the Debtor's objection to CWF's proof of claim, on July 14, 2011,

the California Bankruptcy Court entered the Venue Order transferring the Chapter 11 Case and

the CWF Adversary Proceeding to this Court.

3.    **Filing of Schedules, Meeting of Creditors and Bar Date**

Upon the Debtor's motion, the Court extended the time for the Debtor to file its

Schedules until March 11, 2011 and they were filed on such date. The Schedules provide

detailed information on the Debtor's assets and liabilities, as well as other information about the

Debtor and its operation. The Debtor expects to have amended its Schedules prior to the

approval of this Disclosure Statement.

On June 14, 2011, the Debtor amended the Schedules. The changes in the amended

Schedules include certain intellectual property that was not originally listed on the prior version

of the Schedules and one general unsecured creditor that was not listed on Schedule F.

In addition, on March 22, 2011, the United States Trustee conducted the Section 341 meeting of creditors in the Debtor's chapter 11 case at which the Debtor's management appeared with the Debtor's counsel to answer Creditors' questions about the case.

The Bankruptcy Court established June 20, 2011, as the deadline for the filing of proofs of Claim in the Bankruptcy Case for non-Governmental Units, and August 15, 2011 for Governmental Units.  The Debtor has also filed monthly operating reports and continues to file such reports as they come due.

### 4.    Retention of Professionals

The California Bankruptcy Court authorized the Debtor to retain Pachulski Stang Ziehl & Jones LLP as its general bankruptcy counsel, which employment was approved on March 14, 2011.  The Bankruptcy Court authorized the Debtor to retain Hirschler Fleishcher, P.C. (Virginia local counsel) and Foley & Lardner (special litigation counsel).

### 5.    Objection to Secured Claim of CWF

After the initial status conference on April 1, 2011 regarding the Venue Motion, the attorneys for the Debtor and CWF met and conferred regarding a timeline and procedures for an informal Bankruptcy Rule 2004 investigation regarding the sale of Carter's Grove.  On April 14, 2011, the Debtor and CWF entered into a case management stipulation that set forth various milestones.  CWF produced nearly 6,000 pages of documents in response to the Debtor's informal request for documents.  The foregoing stipulation was twice amended to accommodate the exchange of additional documents requested by the Debtor.  During this informal investigation, the Debtor deposed CWF through the deposition of four employees that are familiar with the events prior to and through the sale of Carter's Grove to the Debtor.  The

parties exchanged settlement offers during the course of the informal Bankruptcy Rule 2004

investigation but were not able to agree on terms that were mutually acceptable.

Consequently, on June 24, 2011, the Debtor commenced the CWF Adversary Proceeding

by filing a complaint against CWF. As described in greater detail in the Complaint, the Debtor

objects to the claim filed by CWF, and asserts affirmative causes of action for recovery against

CWF, on the grounds that CWF knew of, but failed to disclose and actively concealed,

significant defects in the property. Among other things, CWF knew of and actively concealed

long-term and pervasive moisture, water damage, and mold in the historic Mansion on the

property (the "Fraud Claims"), and concealed the disposal of refuse and other debris on the

facility from which hazardous substances are now being released (the "CERCLA Claims"). The

Debtor is informed and believes that CWF knew of these defects and intentionally concealed

them in an effort to mislead the buyer.

On August 17, 2011, the Debtor filed its *Motion to Strike Changes to the Deposition*

*Testimony of the Colonial Williamsburg Foundation and Supporting Memorandum*. In the

foregoing motion, the Debtor is seeking to strike the changes to the deposition testimony of CWF

that change certain answers to questions in response to questions asked by the Debtor relating to

the Fraud Claims. The hearing on this motion is schedule for October 21, 2011.

On August 26, 2011, in response to the complaint filed by the Debtor in the CWF

Adversary Proceeding, CWF filed (i) an *Answer to Complaint* [Docket No. 15], (ii) a *Motion to*

*Dismiss Counts 5 and 6 of Complaint and Memorandum in Support Thereof* [Docket No. 16],

and (iii) Motion to Strike *Jury Demand Pursuant to Fed. R. Civ. P. 39(a)(2) and Memorandum*

*in Support Thereof* [Docket No. 17]. The hearing on items (ii) and (iii) are scheduled for

October 21, 2011.  The Debtor and CWF are currently discussing scheduling of the discovery
timeline and related matters in response to the *Answer to Complaint*.

### 6.   Postpetition Settlement with AVN

As set forth in the treatment section below, the Debtor and AVN have agreed to a
modification of the AVN Lease Documents through the Plan.  Under the Plan, AVN shall retain,
unaltered, all of the legal, equitable and contractual rights of its Secured Claim except that in the
event of a Plan Default, in addition to the remedies AVN may have against Minor, the sole
remedy on account of the AVN Guarantee and the AVN Deed of Trust will be the Orderly Sale
Process, rather than foreclosure.

### 7.   Postpetition Discussions with Sotheby's

As set forth in the treatment section below, the Debtor is in discussions with Sotheby's
regarding a proposed modification to the Sotheby's Settlement through the Plan.  Sotheby's shall
retain, unaltered, all of the legal, equitable and contractual rights of its Secured Claim except that
(i) in the event of a Plan Default, in addition to any remedies Sotheby's has against Minor, the
sole remedy against the Reorganized Debtor will be the Orderly Sale Process, rather than
foreclosure, and (ii) section 2(a) of the Sotheby's Agreement shall be amended to replace
December 31, 2011 with March 31, 2012.

### 8.   Approval of the Disclosure Statement and Solicitation Procedures

On September, 2011, the Debtor filed a notice scheduling approval of the adequacy of the
Disclosure Statement and served such notice on all creditors.  The Bankruptcy Court's order
approving the Disclosure Statement is annexed hereto as **Exhibit B**.

## III.

## DESCRIPTION OF THE PLAN

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims is set forth below. The discussion of the Plan which follows constitutes a summary only, and should not be relied upon for voting purposes. You are urged to read the Plan (which is attached to this Disclosure Statement as **Exhibit A**) in full in evaluating whether to accept or reject the Plan proposed by the Debtor. If any inconsistency exists between this summary and the Plan, the terms of the Plan will control.

A.    **Description Of Classes**

The Plan divides Creditors and Interest Holders into Classes. Creditors with similar Claims are placed in the same Class. There are six (6) Classes of Claims and one (1) Class of Interests under the Plan as follows:

**Class 1 Claims**. Class 1 will consist of all Other Priority Claims.

**Class 2 Claims**. Class 2 will consist of the Secured Claim of CWF.

**Class 3 Claims**. Class 3 will consist of the Secured Claim of AVN.

**Class 4 Claims**. Class 4 will consist of the Secured Claim of Sotheby's.

**Class 5 Claims**. Class 5 will consist of all Other Secured Claims. Each holder of an Allowed Claim in Class 5 will be considered to be in its own separate subclass, and each subclass will be deemed to be a separate Class for purposes of the Plan.

**Class 6 Claims**. Class 6 will consist of all Unsecured Claims.

**Class 7 Interests.** Class 7 will consist of all Interests in the Debtor.

**B.**    **Treatment of Unclassified Claims**

The treatment of unclassified claims is discussed below and in Article III of the Plan.

The Plan sets forth the treatment of Administrative Claims (including Claims for Professional

Fees) and Priority Tax Claims, which are not classified under the Plan.  The Plan also provides

for an Administrative Claims Bar Date, which requires that all requests for payment of

Administrative Claims must be filed on or before the first business date that is thirty (30) days

after the date on which the Bankruptcy Court enters the Confirmation Order; *provided, however,*

holders of Administrative Claims based on liabilities incurred in the ordinary course of the

Debtor's business following the Petition Date are not required to comply with the Administrative

Claim Bar Date, *provided that,* (i) such holders have otherwise submitted an invoice, billing

statement or other evidence of indebtedness to the Debtor in the ordinary course of business, and

(ii) such Claims are not past due according to their terms.

**1.**    **Allowed Administrative Expense Claims**

Each Allowed Administrative Claim, unless the holder of such Claim has agreed to a

different treatment, will be paid in full by a one-time Cash payment by the Reorganized Debtor

on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may

be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the fourteenth day

after such Claim is Allowed, or as soon thereafter as practicable; and (d) such other date as the

holder of such Claim and the Reorganized Debtor may agree.

**2.**    **Allowed Priority Tax Claims**

Each Allowed Priority Tax Claim, unless the holder of such Claim has agreed to a

different treatment, will receive at the option of the Reorganized Debtor the following:  (i)

payment in full in Cash, without interest, by the Reorganized Debtor from Available Cash and/or

the Effective Date Cash Contribution on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the fourteenth Day after such Claim is Allowed, or as soon thereafter as practicable; and (d) such other date as the holder of such Claim and the Reorganized Debtor may agree, or (ii) deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the statutory rate under applicable non-bankruptcy law or at a rate to be agreed upon by the Reorganized Debtor and the appropriate governmental unit or, if they are unable to agree, to be determined by the Bankruptcy Court; provided, however, that the Reorganized Debtor may prepay any or all such Claims at any time, without premium or penalty.  In the event the Reorganized Debtor elects payment option (ii), the payment of each Allowed Tax Claim shall be made in equal quarterly installments with the first installment due on the latest of: (a) the first Business Day following the end of the first full calendar quarter following the Effective Date, (b) the first Business Day following the end of the first full calendar quarter following the date an order allowing such Claim becomes a Final Order, and (c) such other time or times as may be agreed with the holder of such Claim.  Each installment shall include simple interest on the unpaid balance of the Allowed Tax Claim, without penalty of any kind, at the non-default rate of interest prescribed, agreed to or determined under option (ii).  In addition, to the extent the Reorganized Debtor elects payment option (ii), the holder of any Secured Tax Claim shall retain its underlying liens on the applicable collateral pending full payment.

**C.    <u>Treatment of Classified Claims and Interests</u>**

The treatment of classified Claims and Interest is discussed below and in Article IV of the Plan.  A summary of the treatment of classified Claims and Interests is also provided in the

chart set forth in Section 1.F of this Disclosure Statement. As set forth in the Plan and herein, Class 2, Class 3, Class 4, and Class 5 are each impaired and are entitled to vote on the Plan. Class 1, Class 6 and Class 7 are not impaired and are not entitled to vote on the Plan.

### 1.    Allowed Other Priority Claims

Each holder of an Allowed Other Priority Claim will receive full payment of the Allowed amount of such Claim on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim.

### 2.    Secured Claim of CWF

The holder of an Allowed Class 2 Claim will receive the New CWF Note, pursuant to which the holder will receive:

  a) Interest Payments: Interest only shall be payable quarterly in arrears at the rate of 3.25% per annum, with default interest accruing following an uncured Plan Default at the default rate of 5.25% per annum.

  b) Payment Intervals: On the Effective Date, the Debtor shall deposit Cash into the Escrow Account equal to the amount of five (5) quarterly interest payments (determined by the amount of CWF's asserted Secured Claim). After the initial payment is made on the Effective Date, the next interest payment shall be due no later than the 15th day of the month of the quarter ending after the conclusion of the month in which the Effective Date occurs, and each interest payment thereafter shall be due on the 15th day of the month of each succeeding quarter until the CWF Maturity Date.

  c) Distributions. CWF shall be entitled to all accrued interest payments to the extent that CWF's Secured Claim has been approved pursuant to an order that has not been stayed by a court having jurisdiction over such claim. If CWF's Secured Claim is approved after the Effective Date, CWF shall receive all accrued interest payments equal to the aggregate amount that would have otherwise been paid up to that point if the CWF Secured Claim had been approved as of the Effective Date in accordance with the foregoing interest payment schedule.

  d) Maturity: All unpaid amounts due under the CWF Secured Claim, including principal, shall be due and payable on the CWF Maturity Date.

  e) Cure Period upon Default: The Reorganized Debtor shall have fifteen (15) days following receipt of a written Plan Default Notice of a Plan Default to cure any

monetary Plan Default and thirty (30) days to cure any other asserted Plan Default under the New CWF Note. After any Plan Default is not timely cured, the sole remedy shall be the Orderly Sale Process.

**3.    Secured Claim of AVN**

On the Effective Date, the holder of an Allowed Class 3 Claim shall retain, unaltered, all of the legal, equitable and contractual rights to which such Claim entitles the holder except that in the event of a Plan Default, in addition to the remedies AVN may have against Minor, the sole remedy on account of the AVN Guarantee and the AVN Deed of Trust will be the Orderly Sale Process, rather than foreclosure.

**4.    Secured Claim of Sotheby's**

On the Effective Date, the holder of an Allowed Class 4 Claim shall retain, unaltered, all of the legal, equitable and contractual rights to which such Claim entitles the holder except that (i) in the event of a Plan Default, in addition to any remedies Sotheby's has against Minor, the sole remedy against the Reorganized Debtor will be the Orderly Sale Process, rather than foreclosure and (ii) section 2(a) of the Sotheby's Agreement shall be amended to replace December 31, 2011 with March 31, 2012.

**5.    Other Secured Claims**

On or prior to the Effective Date, the Debtor will select, in its discretion, one of the following alternative treatments for each Allowed Other Secured Claim in Class 5, which treatment will be in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Other Secured Claim:

(a)    Abandonment or Surrender: The Debtor will abandon or surrender to the holder of such Claim the property securing such Claim, in full satisfaction and release of such Claim;

(b)   Cash Payment:  The Debtor will pay to the holder of such Claim Cash equal to the amount of such Claim, or such lesser amount to which the holder of such Claim and the Debtor will agree, in full satisfaction and release of such Claim;

(c)   Unimpairment:  The Debtor will leave the rights of the holder of such Claim unimpaired or provide for such other treatment as necessary to otherwise satisfy the requirements of the Bankruptcy Code.

**6.   General Unsecured Claims**

Except to the extent that the holder of an Allowed Unsecured Claim accepts, or has accepted, less favorable treatment, each holder of an Allowed Unsecured Claim will receive, in exchange for and in full and final satisfaction of such Claim Cash in the amount equal to 100% of its Allowed Claim on the later of the Effective Date or the date the Claim is Allowed.

**7.   Interests**

The legal, equitable, and contractual rights of the holder(s) of the Interests shall be left unaltered.

**D.   Implementation of the Plan**

Article V of the Plan provides the principal means for the implementation of the Plan. Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtor to make payments pursuant to the Plan will be obtained from Mr. Minor's infusion of the Effective Date Cash Contribution and subsequent Post-Emergence Cash Contributions, Available Cash (if any), any proceeds from the sale or other disposition of assets of the Reorganized Debtor, as deemed necessary and appropriate by the Reorganized Debtor, and from any other lawful source.

**1.   Effective Date Transactions**

On (or, where appropriate, after) the Effective Date, the following actions will occur: (i) the transactions contemplated under the Plan will be consummated; (ii) Mr. Minor will cause the Effective Date Cash Contribution to be provided to the Debtor; (iii) the Escrow Account will be

established; and (iv) the Reorganized Debtor or Disbursing Agent, if any, will make all Cash

distributions required under the Plan on the Effective Date.

### 2.    Revesting of Estate Assets

Except as otherwise provided in any provision of the Plan including with respect to the

CWF Deed of Trust, the AVN Deed of Trust, and the Sotheby's Deed of Trust, upon the

Effective Date, the Reorganized Debtor will be vested with all right, title and interest in the

Estate Assets free and clear of all Claims and Liens other than any obligations under the Plan.

### 3.    Continued Existence

As of the Effective Date, the Reorganized Debtor will continue to maintain its legal

existence for all purposes under the Plan, and retain all the powers of a legal entity under

applicable law.  The Reorganized Debtor will be authorized to execute such other documents as

are necessary and appropriate to carry out the provisions of the Plan, without the necessity of

filing such documents with the Bankruptcy Court.

### 4.    Management of Reorganized Debtor

The Minor Trust, the trustee and sole beneficiary of which is Mr. Minor, is the owner and

sole member and manager of the Debtor.  Mr. Minor, as trustee of the Minor Trust, manages the

Debtor, and will manage the Reorganized Debtor in accordance with the Plan, the Debtor's

Articles of Organization, as may be amended from time to time, and applicable nonbankruptcy

law.

As discussed above, Mr. Minor has at all relevant times been overseeing the preservation

and management of Carter's Grove since the purchase thereof in 2007.  Mr. Minor is a successful

entrepreneur, having founded CNET, a media company, and various other successful technology

businesses.  Mr. Minor had run and overseen CNET's operations for approximately eight years,

during which time it became one of the Internet's first companies to achieve profitability.  CNET
was later purchased by CBS in 2008 and is now CBS Interactive.

In addition to CNET, Mr. Minor has founded or co-founded the following internet
companies (a) salesforce.com, (b) E! Online, (c) Open DNS, (d) Vignette, (e) ScoutLabs,
(f) Grandcentral/Google Voice, and (g) Snap!/NBCi.  Through Mr. Minor's efforts, these
companies have created value in excess of $56 billion.

Most recently, Mr. Minor, through Minor Studios, is marketing his latest internet product,
Atmosphir, LLC ("Atmosphir").  Through atmosphir.com, Mr. Minor has created a set of online
tools that allow people on the internet to build and share virtual worlds, some of which look like
the real world and others that are pure fantasy.  Since December, 120,000 virtual worlds have
been created on atmosphir.com which can be played on PC, Mac, and soon IPAD.  Atmosphir
generates revenue from the sale of virtual items like clothes, cars, special powers, etc.  The
market in this area is exploding, reaching $10 billion next year.  Atmosphir is quickly growing.
Mr. Minor is the sole owner of Minor Studios, which currently owns approximately 84% of
Atmosphir.  Mr. Minor is currently soliciting proposal for certain convertible debt financing
secured by the assets of Atmosphir and his interest in Atmosphir, which will be used to the
extent necessary to fund payments under the Plan.

An avid preservationist, Mr. Minor is managing Carter's Grove as a personal passion, and
is not paid by the Debtor for his services.

### 5.    Continued Management of Reorganized Debtor

On and after the Effective Date, the Reorganized Debtor shall continue in accordance
with its Articles of Organization, as may be amended from time-to-time, and may use, acquire

and dispose of the Estate Assets without supervision by the Bankruptcy Court and free of any

restrictions under the Bankruptcy Code or the Bankruptcy Rules.

**6.**    **Retained Claims and Defenses**

On and after the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code,

the Reorganized Debtor will retain and may enforce the Retained Claims and Defenses

(including through objections to Claims) with all powers and authority of a debtor in possession

or trustee under the Bankruptcy Code to the extent of and consistent with its authority under the

Plan.  The Reorganized Debtor may investigate Retained Claims and Defenses and may assert,

settle or enforce any such claims or defenses in a manner consistent with the Plan.  To the extent

any Retained Claims and Defenses are already pending on the Effective Date, the Reorganized

Debtor as successor to the Debtor may continue the prosecution of such Retained Claims and

Defenses.  Any proceeds received from or on account of the Retained Claims and Defenses will

constitute Estate Assets and will vest entirely in the Reorganized Debtor.  In connection with the

Retained Claims and Defenses, the Reorganized Debtor will be authorized to (i) effect all actions

and execute all agreements, instruments, and other documents necessary to perform its duties

under the Plan, and (ii) employ and compensate Professionals.  From and after the Effective

Date, except as otherwise provided in the Plan or in the Confirmation Order, the Reorganized

Debtor will be free to operate without supervision by the Bankruptcy Court and free of any

restrictions under the Bankruptcy Code or the Bankruptcy Rules.

The Debtor is not currently aware of any potential causes of action and claims of the

Estate against third parties, other than against its claim against CWF; however, the Debtor's

analysis is ongoing.  The Debtor reserves all its rights with respect to any and all Retained

Claims and Defenses, including the right to object to any Claims as the Debtor completes its

analysis and reconciliation of Claims, including, but not limited to, Claims that were either

asserted, filed or amended after the date of this Disclosure Statement, and in accordance with the

provisions set forth in the Plan and applicable law.

### 7.    **Distribution Procedures**

Except as otherwise agreed by the holder of a particular Claim, or as provided in the Plan,

all amounts to be paid by the Reorganized Debtor or the Disbursing Agent, as applicable, under

the Plan will be distributed in such amounts and at such times as is reasonably prudent, with

sufficient reserves established in the Reorganized Debtor's discretion to satisfy any Disputed and

unpaid Professional Fees.  Unless otherwise provided in the Plan, all distributions to Creditors

will be: (i) in U.S. dollars by check, draft or warrant, drawn on a domestic bank, or by wire

transfer from a domestic bank, and (ii) by first-class mail (or by other equivalent or superior

means as appropriate).

### 8.    **Resolution of Disputed Claims**

All objections to Claims will be filed and served not later than 90 days following the

Effective Date, *provided, that*, such date may extended by the Bankruptcy Court for cause

shown.  If an objection is not timely filed by the deadline established in this Section, any

remaining Disputed Claims will be deemed to be Allowed Claims for purposes of the Plan.

Unless otherwise provided in the Confirmation Order, the Reorganized Debtor will be authorized

to settle, or withdraw any objections to, any Disputed Claim following the Confirmation Date

without further notice to Creditors or authorization of the Bankruptcy Court, in which event such

Claim will be deemed to be an Allowed Claim in the amount compromised for purposes of the

Plan, *provided, however*, that the Bankruptcy Court will retain jurisdiction to hear and adjudicate

the allowance or disallowance of Claims, as provided for in Article IX of the Plan.  Under no circumstances will any distributions be made on account of Disallowed Claims.

9.    **Allocation of Distributions.**

Distributions to any holder of an Allowed Claim will be allocated first to the principal amount of any such Allowed Claim, as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

10.    **Disputed Payments.**

In the event of any dispute between and among Creditors as to the right of any entity to receive or retain any payment or distribution to be made to such entity under the Plan, the Reorganized Debtor or the Disbursing Agent, as applicable, may, in lieu of making such payment or distribution to such entity, instead hold such payment or distribution until the disposition thereof will be determined by the Bankruptcy Court.

11.    **Unclaimed Property.**

Any entity which fails to claim any Cash within 90 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan. Upon forfeiture, such Cash (including interest thereon) shall be made available for distribution to (i) in the event of forfeiture of a payment made on account of an Allowed Unsecured Claim, to the holders of Allowed Unsecured Claims; or (ii) in the event of a forfeiture of a payment made on account of any other claim, to the Reorganized Debtor.  Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Reorganized Debtor or the Disbursing Agent, as applicable, or any holder of an Allowed Claim to whom distributions

are made under this Plan, *provided, however*, that the Disbursing Agent shall undertake reasonable efforts, in its business judgment, to locate creditors whose distributions are returned to the Disbursing Agent without any return or forwarding address.

12.    **Setoffs**

Nothing contained in the Plan will constitute a waiver or release by the Debtor of any right of setoff or recoupment the Debtor or the Reorganized Debtor may have against any Creditor.

13.    **No Distributions on Late-Filed Claims**

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was first filed after the Bar Date will be a Disallowed Claim, and no distribution will be made to a holder of such a Claim, *provided, that*, to the extent such Claim was listed in the Schedules (other than as contingent, disputed, or unliquidated) and would be an Allowed Claim but for the lack of a timely proof of Claim, such Claim will be treated as an Allowed Claim in the amount in which it was so listed.

14.    **Post-Effective Date Reports**

Upon the Effective Date, the Reorganized Debtor shall prepare and submit to the Bankruptcy Court and the Office of the United States Trustee, post-confirmation reports for a revested debtor in the form suggested by the Office of the United States Trustee for Region 4. The first post-confirmation report shall be due within thirty (30) days following the end of the first calendar quarter from the Effective Date and reports shall be filed on a quarterly basis thereafter until the Chapter 11 Case is closed, unless otherwise agreed by the Reorganized Debtor and the Office of the United States Trustee.

15. **Post Effective Date Employment and Compensation of Professionals**

After the Effective Date, professionals for the Debtor will take only those actions as are authorized by the Reorganized Debtor.  Professionals will not be required to file formal applications for Bankruptcy Court approval of post-Effective Date employment or payment of post-Effective Date fees and expenses.  To the extent that the Reorganized Debtor requires Professionals to perform services following the Effective Date, the Reorganized Debtor is authorized to compensate Professionals without further order of the Bankruptcy Court with respect to fees and expenses incurred subsequent to the Effective Date.

16. **Final Decree**

Upon substantial consummation of the Plan, the Reorganized Debtor will be authorized to file a motion for the entry of a final decree closing the Chapter 11 Case pursuant to section 350 of the Bankruptcy Code.  Concurrently with the motion for entry of final decree, the Reorganized Debtor will also file a report with the Court and the Office of the United States Trustee that sets forth the distributions made by the Reorganized Debtor pursuant to the Plan.

E. **Executory Contracts**

Article VI of the Plan sets forth procedures governing the assumption and rejection of the Debtor's executory contracts and unexpired leases.

Upon the Effective Date, the Debtor will assume each of the Assumed Contracts except for any Rejected Contracts identified in the Plan Supplement.  The Debtor reserves the right to make additions to the Plan Supplement up to fourteen (14) days prior to the date on which objections must be filed to the Plan with respect to the Confirmation Hearing.  The Reorganized Debtor will be responsible for all Cure Obligations, if any, with respect to the Assumed Contracts.

The Rejected Contracts are any contracts and leases listed in the Plan Supplement. Inclusion of a contract or lease in the Plan Supplement does not constitute a waiver by the Debtor or the Reorganized Debtor of the right to contend that some or all of such contract or lease is not executory. Any Rejection Claim arising from the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed within thirty (30) days of entry of the Confirmation Order, provided that such deadline is not applicable to any executory contract or unexpired lease rejected prior to the Effective Date and for which a different Rejection Claim Bar Date was previously fixed by the Bankruptcy Court pursuant to Bankruptcy Rule 3002(c)(4). The notice of entry of the Confirmation Order will provide the Rejection Claim Bar Date for agreements rejected pursuant to the Plan. Any Rejection Claim not filed by the applicable Rejection Claims Bar Date will be a Disallowed Claim and will be forever barred as a Claim against the Debtor, the Reorganized Debtor, or any property of the Debtor and from sharing in any distribution under the Plan.

**F.   Conditions to Confirmation of the Plan**

Confirmation of the Plan is conditioned upon the entry of an order confirming the Plan which will, among other things, (a) authorize the implementation of the Plan in accordance with its terms; (b) contain findings supported by evidence adduced at the Confirmation Hearing that the Plan is proposed in good faith, that all actions contemplated by the Plan are necessary to implement the restructuring contemplated by the Plan are authorized by all corporate action, and pursuant to section 1145(a) of the Bankruptcy Code the issuance of securities, if any, and the grant of liens and security interests pursuant to the Plan are not subject to any stamp, real estate, or transfer tax; (c) issue the injunction set forth in the Plan, effective as of the Effective Date; (d) decree that on the Effective Date, the revesting of assets in the Debtor contemplated by the

Plan is or will be legal, valid and effective, and vest or will vest in the Reorganized Debtor good and marketable title to such property free and clear of all Liens, Claims, and Interests except as provided in the Plan; and (e) confirm the Plan and authorize implementation in accordance with its terms. If any of the foregoing terms and conditions is not met, the Debtor may, at its sole option, withdraw the Plan and, if withdrawn, the Plan will be of no further force or effect.

The effectiveness of the Plan is subject to the Confirmation Order becoming a Final Order, unless waived by the Debtor. If no stay of the Confirmation Order is then in effect, the Plan will become effective.

## G.    **Effects of Confirmation**

### 1.    **Binding Effect**

The provisions of the confirmed Plan will bind the Debtor, the Reorganized Debtor, any entity acquiring property under the Plan, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has filed a proof of Claim or Interest in the Chapter 11 Case, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan. All Claims and Debts will be as fixed and adjusted pursuant to the Plan. With respect to any taxes of the kind specified in Bankruptcy Code section 1146(a), the Plan will also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded including the transfer of any property pursuant to the Orderly Sale Process.

2. **Revesting of Property Free and Clear**

Upon the Effective Date, title to all Estate Assets will vest in the Reorganized Debtor for the purposes contemplated under the Plan and will no longer constitute property of the Estate pursuant to section 541 of the Bankruptcy Code.  Except as otherwise provided by the Plan, including with respect to the CWF Deed of Trust, the AVN Deed of Trust and the Sotheby's Deed of Trust, and to the full extent allowed by sections 1141(b) and (c) of the Bankruptcy Code, upon the Effective Date, all Estate Assets will be free and clear of all Claims, Liens and Interests, including Unsecured Claims.  Following the Effective Date, the Reorganized Debtor may use, acquire or dispose of any such property free of any restrictions imposed by the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.  Except as otherwise expressly provided in the Plan or Confirmation Order, all rights or causes of action are hereby preserved and retained for enforcement solely and exclusively by and at the discretion of the Reorganized Debtor.

3. **Discharge of Debtor**

Except with respect to the Assumed Obligations and as otherwise provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims.  Confirmation of the Plan will discharge the Debtor and the Reorganized Debtor from all Claims or other debts that arose at any time before the Effective Date (other than the Assumed Obligations), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (i) a Proof of Claim based on such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (ii) a Claim based on such debt is Allowed

under section 502 of the Bankruptcy Code; or (iii) the holder of a Claim has accepted the Plan.

As of the Effective Date all entities that have held, currently hold or may hold a Claim or other

debt or liability that is discharged or any other right that is terminated under the Bankruptcy

Code or the Plan are permanently enjoined from commencing or continuing any action, the

employment of process, or other action, to collect, recover or offset any such Claim as a liability

of the Debtor or the Reorganized Debtor to the full extent permitted by section 524 of the

Bankruptcy Code.

4.    **Injunction**

The Confirmation Order will be a judicial determination, effective on the occurrence of

the Effective Date, of discharge and termination of all liabilities and of all claims against the

Debtor and the Reorganized Debtor as provided in the Plan.  On the Effective Date, and except

as otherwise provided by the Plan, all entities who have held, hold or may hold Claims against or

Interests in the Debtor or the Debtor's estate that arose prior to the Effective Date are ·

permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly,

any action or other proceeding of any kind against the Reorganized Debtor with respect to any

such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or

means, directly or indirectly, of any judgment, award, decree, or order against the Reorganized

Debtor or any assets or property of the Reorganized Debtor with respect to any such Claim or

Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of

any kind against the Reorganized Debtor or any property of the Reorganized Debtor with respect

to any such Claim; (d) asserting, directly or indirectly any obligation against the Reorganized

Debtor or any property of the Reorganized Debtor with respect to any such Claim or Interest; and

(e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the

provisions of the Plan with respect to such Claim or Interest. Except as otherwise provided in

the Plan, no claims of the Debtor or Reorganized Debtor against any person or entity will be

discharged, released, or compromised pursuant to the Plan or Confirmation Order.

5. **Full and Final Satisfaction.**

Commencing upon the Effective Date, the Reorganized Debtor or the Disbursing Agent,

as applicable, will be authorized and directed to distribute the amounts required under the Plan to

the holders of Allowed Claims according to the provisions of the Plan. Upon the Effective Date,

all Debts of the Debtor will be deemed fixed and adjusted pursuant to the Plan and the Debtor

and the Reorganized Debtor will have no further liability on account of any Claims or Interests

except as set forth in the Plan. All payments and all distributions made by the Reorganized

Debtor or the Disbursing Agent, as applicable, under the Plan will be in full and final

satisfaction, settlement and release of all Allowed Claims.

6. **Limitation of Liability**

The Debtor, the Reorganized Debtor and their respective members, officers, directors,

managers, employees, agents, and representatives (collectively, the "Exculpated Parties"), will

neither have nor incur any liability to any entity for any action in good faith taken or omitted to

be taken in connection with or related to the Chapter 11 Case or the formulation, preparation,

dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure

Statement, or any agreement created or entered into in connection with the Plan or incident to the

Chapter 11 Case, *provided, that*, this limitation will not affect or modify the rights of any holder

of an Allowed Claim to enforce its rights under the Plan or the non-debtor party to an Assumed

Contract to enforce its rights under the Assumed Contract, nor will the foregoing exonerate any

of the Exculpated Parties from any liability that is determined that would otherwise result from

an act or omission to the extent such act or omission is determined by Final Order to have constituted gross negligence or willful misconduct. In addition, notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, will have any right of action against any Exculpated Party for any act or omission in connection with, relating to or arising out of the Chapter 11 Case or the consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan, or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

## IV.

## OTHER PLAN PROVISIONS

### A.   Retention of Jurisdiction

From and after the Confirmation Date, the Bankruptcy Court will retain such jurisdiction as is legally permissible, including, but not limited to, for the purposes set forth in Article IX of the Plan.

**B.**    **Exemption from Transfer Taxes**

Pursuant to the provisions of section 1146(a) of the Bankruptcy Code, the issuance,

transfer, or exchange of notes or equity securities, if any, under the Plan, the creation of any

mortgage, deed of trust or other security interest, the making or assignment of any lease or

sublease, the sale or other transfer of any assets by the Debtor or Reorganized Debtor to a third

party, or the making or delivery of any deed or other instrument of transfer under, in furtherance

of, or in connection with the Plan, including any deeds, bills of sale or assignments executed in

connection with any of the transactions contemplated under the Plan, including transfer by way

of the Orderly Sale Process, will not be subject to any stamp, real estate transfer, mortgage

recording, sales, or other similar tax.

**C.**    **Post-Confirmation Date Notices**

From and after the date the Confirmation Order becomes a Final Order, notices of

appearances and demands for service of process filed with the Court prior to such date will no

longer be effective.  No further notices (other than notice of entry of the Confirmation Order)

will be required to be sent to any entities other than the Office of the U.S. Trustee and any party

who files a renewed request for service of pleadings.

**D.**    **Certain Actions**

By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as

appropriate), all matters provided for under the Plan that would otherwise require approval of the

owners, members, directors, managers, or officers of the Debtor under the Plan, including,

without limitation, (a) the distribution of Cash pursuant to the Plan, (b) the adoption, execution,

delivery, and implementation of all contracts, leases, instruments, releases, and other agreements

or documents related to the Plan, and (c) the adoption, execution, and implementation of other

matters provided for under the Plan involving the company or organizational structure of the

Debtor will be deemed to have occurred and will be in effect prior to, on or after the Effective

Date (as appropriate), pursuant to the applicable limited liability company and/or other

applicable business entity laws of the state in which the Debtor or the Reorganized Debtor is

chartered, organized or incorporated, without any requirement of further action by the owners,

members, directors, managers, or officers of the Debtor.

V.

**TAX DISCLOSURE**

A.    **Tax Implications**

Implementation of the Plan may have federal, state, and local tax consequences to the

Debtor and Creditors. No tax opinion has been sought or will be obtained with respect to any tax

consequences of the Plan, and the following disclosure (the "Tax Disclosure") does not

constitute and is not intended to constitute either a tax opinion or tax advice to any person.

Rather, the Tax Disclosure is provided for informational purposes only.

Moreover, the Tax Disclosure summarizes only certain of the federal income tax

consequences associated with the Plan's implementation, and does not attempt to comment on all

such aspects of the Plan's implementation. In addition, certain of the federal income tax

consequences described in the Tax Disclosure are dependent on factual determinations that are

subject to uncertainties. Similarly, the Tax Disclosure does not attempt to consider any facts or

limitations applicable to any particular Creditor which may modify or alter the consequences

described below. The Tax Disclosure also does not address state, local, or foreign tax

consequences or the consequences of any federal tax other than the federal income tax. No

assurance can be given that legislative, judicial, or administrative changes will not be

forthcoming that would affect the accuracy of the discussion below. Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof. Finally, the tax consequences of certain aspects of the Plan are uncertain due to a lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

Creditors, therefore, are advised to consult with their own tax advisors regarding the tax consequences to them of the transactions contemplated by the Plan, including federal, state, local, and foreign tax consequences.

### 1.   Tax Consequences to the Reorganized Debtor

On the Effective Date, the Interest Holder will continue to retain the Interests. The Reorganized Debtor will comply with its tax reporting and filing obligations with governmental authorities, to the extent it has any, as appropriate and proper under various tax laws and regulations to which it is subject.

### 2.   Tax Consequences to Creditors

Pursuant to the Plan, holders of Allowed Claims will receive distributions of Cash in exchange for their Allowed Claims. Whether and the extent to which such a payment to a Creditor holding an Allowed Claim is includible in the holder's gross income will be determined by reference to the claim in respect of which the distribution is made. The holder may recognize ordinary income in respect of such payment if the claim is in respect of an item generating ordinary income, such as wages, to such holder. Similarly, if a claim is held as part of a trade or business, the holder of such claim may recognize ordinary loss to the extent that such holder's adjusted basis in the claim exceeds the amount received by such holder with respect to such claim. Any distribution attributable to accrued but unpaid interest may be treated as ordinary

income, regardless of whether the origin of the claim is capital in nature or whether gain or loss

is otherwise recognized on the Claim.

EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR

REGARDING THE CONSEQUENCES FOR SUCH CREDITOR OF THE TRANSACTIONS

CONTEMPLATED BY THE PLAN.

**VI.**

**<u>LIQUIDATION ANALYSIS</u>**

With respect to each impaired class of claims and interests, confirmation of a plan

requires that each such holder either (a) accept the plan or (b) receive or retain under the plan

property of a value, as of the effective date of the plan, that is not less than the value such holder

would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

This requirement is referred to as the "best interests test." This analysis requires the Bankruptcy

Court to determine what the holders of allowed claims and allowed interests in each impaired

class would receive from a liquidation of the debtor's assets and properties in the context of a

liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best

interests of each impaired class, the value of the distributions from the proceeds of the

liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the

aforesaid claims) is then compared with the value offered to such classes of claims and interests

under the plan.

In a chapter 7 liquidation, the cash available for distribution to creditors would consist of

the proceeds resulting from the disposition of the unencumbered assets of the debtor, augmented

by the unencumbered cash held by the debtor at the time of the commencement of the liquidation

case.  Such cash amount would be reduced by the costs and expenses of the liquidation,

including, but not limited, to the appointment of a trustee and the trustee's employment of
attorneys and other professionals, and by such additional administrative and priority claims that
may result from the termination of the debtor's business and the use of chapter 7 for the purpose
of liquidation.

Here, since the Plan provides for **full payment** to holders of Allowed Claims and
Interests, by definition, the Plan satisfies the "best interest" test because the amount proposed to
be paid to Creditors and Interest Holders –full payment– is not less than the amount each
Creditor and Interest Holder would receive if the Debtor was liquidated under chapter 7 of the
Bankruptcy Code. In fact, the Debtor estimates that, given the unique nature of Carter's Grove, a
liquidation of its assets under chapter 7 of the Bankruptcy Code would adversely affect the value
of the Debtor's assets and potentially result in less than full recovery to Creditors.

For example, the May 2011 appraisal of the Debtor's asset provides that any sale of the
property should be preceded by a marketing period of up to twelve (12) months. If the Chapter
11 Case was converted to case under chapter 7 of the Bankruptcy Code and the Debtor's assets
converted to Cash through a liquidation sale, the value of the property would likely be reduced
by as much as 20% to 40%.

In addition, under a chapter 7 liquidation, other factors could affect the value of the
Debtor's assets and recoveries of Creditors: (a) the increased costs and expenses of a chapter 7
liquidation, including the appointment of a trustee, the trustee's employment of attorneys and
other professionals (including a real estate broker that would be entitled to a commission for the
sale of the property), and additional administrative and priority claims that may result from the
continued administration of the case and management of the Debtor's assets; (b) the expected
delay in distributions to holders of impaired Claims and Interests; and (c) the likelihood that

assets may need to be sold or otherwise disposed of in a less orderly fashion and that the value

achievable for such assets in a chapter 7 liquidation might be less than realized in chapter 11.

In light of the fact that all holders of impaired Claims or Interests are being paid in full

under the Plan, the "best interest" test is satisfied.

## VII.

## RISK ANALYSIS

As noted above, the recovery of Creditors is not solely tied to the substantial equity in the

Debtor's assets (assuming that the transactions under the Plan are consummated) because

generally Creditors with Allowed Claims will be paid through the funding provided by Mr.

Minor -- the Effective Date Cash Contribution (funded on the Effective Date), the subsequent

Post-Emergence Cash Contributions, and distributions from the Escrow Account.  There are

events that could occur and risk associated with the Debtor's reorganization that could

conceivably hinder the Debtor's ability to meet its Plan obligations.  These events and risk

factors include, but are not limited to the following:

(a)     Unforeseen financial difficulties of Mr. Minor:  The Debtor's ability to

implement the Plan and pay its ongoing obligations is dependent on Mr. Minor's personal

financial situation.  Nevertheless, the Debtor will show on or before the deadline to object to

Confirmation that Mr. Minor has the Cash to make the payment contemplated under the Plan on

the Effective Date, which includes the interest payments with respect to the CWF Secured Claim

as set forth in section 4.2 of the Plan.  The Debtor believes that the Plan is feasible because Mr.

Minor will have sufficient liquidity to fund the payment contemplated under the Plan on the

Effective Date.  Insofar as the CWF Secured Claim is concerned, Mr. Minor will continue to

deposit quarterly interest payments into the Escrow Account as set forth in section 4.2 of the

Plan. In the event Mr. Minor's financial condition and/or liquidity is adversely affected after the Effective Date, the Debtor's assets will be sold pursuant to the Orderly Sale Process. During this time, CWF's claim will be adequately protected because the Escrow Account will already contain Cash equal to the amount the interest payments that would have been paid during the marketing period under the Orderly Sale Process had the Plan Default not occurred. Thus, upon the occurrence of the Orderly Sale Process, the Debtor believes that Creditors will nonetheless be paid in full given the substantial equity in the Debtor's assets and the reserve that will be deposited in the Escrow Account during this period.

(ii)    <u>Unforeseen events affecting the Reorganized Debtor and the Carter's Grove</u>: Further, unforeseen events or circumstances may adversely affect the Carter's Grove, including, without limitation, acts of god, unforeseen or materially underestimated expenses (including Allowed Claims in amounts higher than expected). However, the Debtor believes that it will be able to satisfy the expenses of the Debtor as they come due.

In sum, although the Debtor currently expects that all of the transactions required under the Plan (including Mr. Minor's timely funding of the Post-Emergence Cash Contributions) will be consummated, there is always a risk that an unforeseen development could affect either the confirmation or the implementation of the Plan or affect the transactions contemplated under the Plan after confirmation. Finally, while the Debtor believes that the Plan satisfies all of the confirmation requirements under section 1129 of the Bankruptcy Code, there is no guarantee that the Bankruptcy Court will concur with this analysis and necessarily confirm the Plan.

## VIII.

## CONFIRMATION OF THE PLAN

The Debtor will seek confirmation of the Plan at the Confirmation Hearing, pursuant to applicable provisions of the Bankruptcy Code.

### A.   Confirmation Hearing

The Bankruptcy Court will hold a hearing on [DATE], 2011 to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied. The hearing on confirmation will be held at the United States Bankruptcy Court for the Eastern District of Virginia (Newport News Division), [#], [ ], Virginia.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. Any objection to confirmation of the Plan must be made in writing and specify the legal grounds for such objection, the nature and amount of the Claim held by such party, and must be filed with the Bankruptcy Court, together with proof of service, and served on all required parties by the objection deadline set by the Bankruptcy Court. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.   Requirements For Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the provisions of section 1129 of the Bankruptcy Code have been satisfied. If all of the provisions of section 1129 of the Bankruptcy Code are met, the Bankruptcy Court may enter an order confirming the Plan. The Debtor believes that all of the requirements of section 1129 of the Bankruptcy Code will be satisfied. Among other things, the Debtor believes that the Plan will be

accepted by the requisite number of votes and satisfies all of the statutory requirements of

chapter 11 of the Bankruptcy Code.  The Debtor submits that it has complied or will have

complied with all of the requirements of chapter 11, and that the Plan has been proposed and is

made in good faith.  In addition, the Debtor submits that the Plan satisfies the "best interest" of

creditors test and is not likely to be followed by liquidation or the need for further

reorganization.

**C.**   **Classification of Claims and Interests**

The Bankruptcy Code requires that a plan of reorganization place each creditor's claim

and each equity interest in a class with other claims or interests that are "substantially similar."

The Plan establishes seven (7) Classes of Claims and Interests.  Under the Plan, Claims which

are secured or entitled to priority are placed in separate Classes from Unsecured Claims.  Article

II of the Plan sets forth the description of the Classes of Claims and Interests.

The Debtor believes that the Plan's classification of Claims and Interests fully complies

with the requirements of the Bankruptcy Code.

**D.**   **Acceptance**

As a condition to Confirmation, the Bankruptcy Code requires that each class of holders

of claims or interests accept the plan, except as otherwise described in this Disclosure Statement.

The Bankruptcy Code defines acceptance by a class of holders of claims as acceptance by

holders of two-thirds (2/3) in dollar amount and a majority in number of claims of that class, but

for this purpose counts only those who actually vote to accept or reject the plan.  Holders of

claims who fail to vote are not counted as either accepting or rejecting the plan.

Classes of claims and interest that are not "impaired" under a plan are deemed to have

accepted the plan.  A class is generally "impaired" if the legal, equitable, or contractual rights

attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturities or by payment in full in cash. A class that receives nothing under a plan is deemed to reject such plan.

IN THIS CASE, CLASS 2, CLASS 3, CLASS 4, AND CLASS 5 ARE IMPAIRED UNDER THE PLAN AND ENTITLED TO VOTE ON THE PLAN TO THE EXTENT THE CLAIMS IN SUCH CLASSES ARE NOT DISPUTED.

### E.    <u>Best Interests of Creditors</u>

As addressed above, the Debtor believes that confirmation of the Plan is in the best interests of the holders of Claims because Creditors are being paid in full under the Plan. Creditors are not entitled to more than full payment. Moreover, in light of the unique nature of Carter's Grove, a liquidation sale, rather than an Orderly Sale Process, could result in Creditors receiving less than full payment..

### F.    <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Plan proposed by the Debtor satisfies these requirements and is "feasible" because the implementation of the Plan and the reorganization of the Debtor's affairs will be funded by the Effective Date Cash Contribution and the Post-Emergence Cash Contributions contributed by Mr. Minor who has substantial personal net worth and has a demonstrated track record in private equity, generating average annual adjusted income since 1998 (not inclusive of 2010, which is not yet due) of $24 million per year. No later than the objection deadline for the hearing on

Confirmation, Mr. Minor will show that he has sufficient Cash available to make the payments required under the Plan on the Effective Date to be contributed to the Debtor and the Reorganized Debtor. Mr. Minor anticipates that one of his principal private equity investments – Minor Studios and Atmophir– will generate substantial cash through certain convertible debt financing prior to the objection deadline for the hearing on Confirmation and such Cash to the extent necessary will provide one of the key sources of funding of the Plan.

As contemplated by section 4.2 of the Plan, Mr. Minor will make a payment on account of the asserted CWF Secured Claim equal to the amount of five (5) quarterly interest payments (determined by the amount of CWF's asserted Secured Claim). Mr. Minor will continue to make regular quarterly interest payments each quarter after the Effective Date until the CWF Maturity Date. As a result, on the Effective Date, there will be a reserve for the CWF Secured Claim equal to the amount of the payments owing on such claim for the first year and one quarter after the Effective Date. If after the Effective Date, Mr. Minor's liquidity is not sufficient to satisfy the obligations under the Plan and a Plan Default occurs that is not timely cured, the Plan provides that the Debtor's assets shall be converted to Cash through the Orderly Sale Process. CWF's claim will be adequately protected during this time because the Escrow Account will already contain Cash equal to the amount the interest payments that would have been paid during the marketing period under the Orderly Sale Process had the Plan Default not occurred. Thus, the Lienholders, in particular CWF, are in the same position if the terms of the Plan contemplated the sale of Carter's Grove as opposed to Mr. Minor making regular payments. In either case, under the Plan, Creditors will be paid in full either through periodic payments from Cash supplied from Mr. Minor or from the proceeds of sale of Carter's Grove and are adequately protected.

### G. <u>Cramdown</u>

A court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that the court find that a plan is "fair and equitable" and does not "discriminate unfairly" with respect to each non-accepting impaired class of unsecured claims or interests. With respect to a dissenting class of unsecured claims, the "fair and equitable" standard requires, among other things, that a plan contain one of two elements. It must provide either that each holder of an unsecured claim in such class receive or retain property having a value, as of the effective date of a plan, equal to the allowed amount of its claim, or that no holder of allowed claims or interests in any junior class receive or retain any property on account of such claims or interests. With respect to a dissenting class of interests, the "fair and equitable" standard requires that the plan contain one of two elements. It must provide either (i) that each holder of an interest in the class receive or retain property having a value, as of the Effective Date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests, or (ii) that no holder of an interest in any junior class receive or retain any property on account of such interests. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive a distribution is known as the "absolute priority rule."

The Debtor will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or modify the Plan in accordance with the terms thereof.

**H.**   **Alternatives to Confirmation of Plan**

If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives
include (i) liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code; or
(ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy
Code.

If the Plan is not confirmed, the Debtor will decide which alternative to pursue by
weighing each of the available options and choosing the alternative or alternatives that are in the
best interests of the Debtor, its Creditors and other parties in interest.  However, the Debtor
believes that the Plan, as proposed, provides the greatest possible return currently available for
the holders of Claims in this chapter 11 case.

**IX.**

**RECOMMENDATION AND CONCLUSION**

Based on the foregoing, the Debtor believes that the Plan is in the best interests of
Creditors and urges Creditors to vote to accept the Plan.

Dated:   September 1, 2011                    CARTER'S GROVE, LLC


                                   By   /s/ Halsey M. Minor
                                        Halsey M. Minor,
                                        Trustee for the Halsey McLean
                                        Revocable Trust 11304

Dated:  September 1, 2011

Respectfully Submitted,

By: /s/ Sheila deLa Cruz
    Robert S. Westermann (VSB No. 43294)
    Sheila deLa Cruz (VSB No. 65395)
    Hirschler Fleischer, P.C.
    The Edgeworth Building
    2100 East Cary Street
    Richmond, Virginia 23223
    P.O. Box 500
    Richmond, Virginia 23218-0500
    Phone: (804) 771-9500
    Facsimile: (804) 644-0957
    Email:   rwestermann@hf-law.com
            sdelacruz@hf-law.com

    and

    Debra I. Grassgreen (*pro hac vice*)
    John W. Lucas (*pro hac vice*)
    Pachulski Stang Ziehl & Jones LLP
    150 California Street, 15th Floor
    San Francisco, California 94111-4500
    Phone: (415) 263-7000
    Facsimile: (415) 263-7010
    Email:   dgrassgreen@pszjlaw.com
            jlucaspszjlaw.com

    *Counsel to the Debtor and Debtor in Possession*

## EXHIBIT A

**(Debtor's Plan of Reorganization)**

# EXHIBIT B

**(Disclosure Statement Order)**